# Court of Appeals, State of Michigan

# ORDER

Power Play International Inc v Del Reddy

Docket No. 325805

LC No. 2011-123508-CK

Donald S. Owens
Presiding Judge

Stephen L. Borrello

Cynthia Diane Stephens
Judges

The Court orders that the June 9, 2016 opinion is hereby, VACATED, and a new opinion is attached.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

JUL 26 2016

Date

Chief Clerk

POWER PLAY INTERNATIONAL, INC, and
GORDON HOWE,

        Plaintiffs-Counter-Defendants-
        Appellees,

v

DEL REDDY,

        Defendant-Appellant,

and

AARON HOWARD, MICHAEL REDDY, and
IMMORTAL INVESTMENTS, LLC,

        Defendants-Counter-Plaintiffs-
        Appellants.

UNPUBLISHED
July 26, 2016

No. 325805
Oakland Circuit Court
LC No. 2011-123508-CK

Before: OWENS, P.J., and BORRELLO and STEPHENS, JJ.

PER CURIAM.

Following a jury trial, defendants Del Reddy, Aaron Howard, Michael Reddy, and Immortal Investments, appeal as of right a judgment entered by the trial court in favor of plaintiffs Power Play International, Inc. (PPI) and Gordon (Gordie) Howe, and against defendants, jointly and severally, for $3,000,000. The judgment also ordered defendants to pay $80,765 in attorney fees, plus costs of $4,245.04, as well as statutory interest. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

This case arises from allegations that defendants unlawfully retained hockey merchandise that was in their possession, but belonged to plaintiffs, and used it for their own benefit and profit. The background facts presented here are drawn from this Court's opinion in *Power Play Int'l, Inc v Reddy*, unpublished opinion per curiam of the Court of Appeals, issued September 22, 2011 (Docket No. 298774), a previous matter involving the same parties.

> The underlying lawsuit was initiated in 2007 and was settled the following year. Pursuant to the terms of the parties' settlement agreement, an injunction was issued permanently enjoining defendants from "possessing, using, selling,

-1-

storing, or in any way profiting from" a comprehensive list of items associated with Detroit Red Wing hockey legend Gordie Howe. Also, as set forth in the agreement, the court dismissed all remaining claims with prejudice. The settlement agreement further required defendants to return numerous items related to Howe, his family, and plaintiff Power Play International, Inc [by November 24, 2008]. Using a 16-foot moving truck and two passenger vans, defendants indeed delivered hockey merchandise and memorabilia to plaintiffs as mandated by the settlement agreement. However, defendants also gave plaintiffs two invoices from a company named "Shred-It" that reflected the destruction of papers, tapes, CDs, and DVDs at the request of defendants. An affidavit from an operations manager employed by Shred-It confirmed the destruction of the items. There is no dispute that the items were associated with Gordie Howe, nor is there a dispute that the items were destroyed; rather, defendants contend that the destruction was consistent with the settlement agreement, whereas plaintiffs maintained that the destruction constituted a violation of the settlement agreement.

Thereafter, plaintiffs, claiming a violation of the settlement agreement, filed a motion for entry of consent judgment seeking the stipulated/liquidated damages set forth in ¶ 4 of the settlement agreement, which was in the amount of $60,000, plus costs, attorney fees, and any sums improperly received by defendants. There is no dispute that ¶ 4 permits the entry of a consent judgment upon a violation of the permanent injunction, and a consent judgment and the permanent injunction were incorporated into the settlement agreement by way of reference and attachments as exhibits to the agreement. The controversy is whether the consent judgment can be entered for violation of the settlement agreement as opposed to a violation of the permanent injunction. The trial court, finding that a violation of the permanent injunction was necessary for plaintiffs to collect the stipulated damage award found in the consent judgment, denied plaintiffs' motion with respect to entry of the consent judgment and an award of $60,000. The trial court also found, however, that defendants had breached the terms of the settlement agreement, and it ordered a hearing to establish the amount of damages to be awarded. [*Id.*, p 1-2.]

This Court reviewed the language of the parties' settlement agreement and the associated consent judgment language and determined that the terms of the consent judgment are limited to violations of the permanent injunction. *Id.* at 2-3. In other words, this Court determined that if the alleged breach of the settlement agreement is a breach of the permanent injunction, the aggrieved party may pursue entry of a consent judgment. *Id.* at 3. However, if the alleged breach does not involve the permanent injunction, the aggrieved may not pursue entry of a consent judgment. *Id.* This Court held that plaintiffs could pursue a claim for breach of the settlement agreement, but they had to file a separate breach of contract action, and not a motion for entry of consent judgment. *Id.* This Court reversed and remanded for further action consistent with the opinion. *Id.*

On remand, plaintiffs filed the current action, claiming breach of the parties' settlement agreement. The complaint was premised on the destruction of the items referenced in the Shred-It invoices and an affidavit from a Shred-It employee. The invoices and affidavit indicate that on

November 20, 2008, defendants requested that Shred-It destroy 8 bankers boxes containing 402 compact discs (CDs) and 861 tapes and 17 bankers boxes containing paper, and that on November 22, 2008, defendants requested that Shred-It destroy 9 bankers boxes containing paper and 3 bankers boxes containing 134 DVDs and 528 tapes.[1]

Following motions for summary disposition submitted by both parties, the trial court granted plaintiffs' motion for summary disposition regarding liability and denied defendants' motion for summary disposition regarding damages. After various motions in limine were addressed by the trial court, the case proceeded to a jury trial on the issue of damages only. The jury awarded $3,000,000 in damages to plaintiffs. Pursuant to a post-judgment motion and following an evidentiary hearing regarding reasonableness, the trial court ordered defendants to pay $80,765 in attorney fees, plus costs of $4,245.04, as well as statutory interest.

## II. SUMMARY DISPOSITION

Defendants first argue on appeal that the trial court erred by granting plaintiffs' motion for summary disposition regarding liability and denying defendants' motion for summary disposition regarding damages. We review de novo a trial court's decision regarding a motion for summary disposition pursuant to MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, to determine whether the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118-119; 597 NW2d 817 (1999). In doing so, we consider "the pleadings, admissions, and other evidence submitted by the parties in a light most favorable to the nonmoving party." *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008). Summary disposition is appropriate when there is no genuine issue of material fact. *Id.* A genuine issue of material fact exists "when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008).

Defendants first argue that the trial court erred by granting plaintiffs' motion for summary disposition regarding liability because the trial court erroneously relied on its decision in the previous case, despite the fact that this Court reversed that ruling. Specifically, defendants reference the trial court's reliance on its June 3, 2010 order which found that defendants "breached the settlement agreement by destroying items as evidenced by the two Shred-It invoices and the affidavit of the employee of Shred-It." Contrary to defendants' assertion, this Court did not reverse the trial court's factual determinations regarding the breach of the settlement agreement. Rather, it reversed the trial court's decision because it concluded that plaintiffs could not seek damages for breach of the settlement agreement through a motion for entry of a consent judgment; they had to file a separate action for breach of contract. *Power Play Int'l, Inc*, unpub op at 3.

---

[1] Defendants also filed a counter-complaint against plaintiffs in the current action. Nothing related to the counter-complaint is being challenged on appeal, and therefore, will not be discussed.

Further, defendants suggest the trial court merely reinstated its decision from the previous case, but the trial court's opinion reveals otherwise. In its opinion, the trial court explained that it based its decision on a review of the record and pleadings in the current action as well as those in the underlying action. It specifically found that "destroying items (i.e., shredding items) and failing to turn them over to plaintiff constituted a breach of the settlement agreement." While it took into consideration its previous order, there was no error in this regard, particularly where the facts did not change and plaintiffs supported their motion with the same Shred-It invoices and employee affidavit.

## A. BREACH OF CONTRACT

Defendants next argue that the trial court erred by granting plaintiffs' motion for summary disposition regarding liability, because a reading of the settlement agreement shows that defendants complied with the agreement when they chose to permanently erase some items rather than turn them over to plaintiffs. The rules of contract construction and interpretation are applied to settlement agreements. *Reicher v SET Enterprises, Inc*, 283 Mich App 657, 663; 770 NW2d 902 (2009). When construing a contract, the court looks to the language and gives the words used their plain and ordinary meanings. *Id*. at 664. If a contract provision is unambiguous, it reflects the parties' intent as a matter of law and the language is construed and enforced as written. *Id*. at 664-665.

Defendants next argue that, pursuant to ¶ 3(c) of the settlement agreement, not every item in defendants' possession that depicted, related to, or pertained to the Howe family had to be turned over to plaintiffs. Defendants argue that they could opt to permanently erase some items, and that is exactly what they did with respect to their personal property that "in anyway may have depicted, related to, or pertained to the Howe family." Therefore, defendants assert that they complied with the settlement agreement.

By its plain language, ¶ 3(b) of the settlement agreement directs defendants to turn over to plaintiffs "originals and copies of *any and all* films, CD's, and other analog, electronic, or digital media depicting *any image* of Plaintiffs and/or members of the Howe Family" and "*all personal property* depicting, relating, or in any way pertaining to Plaintiffs and/or any member of the Howe Family, signed or unsigned, personalized or not, *including but not limited to . . .any other item of physical property*." (Emphasis added.) Paragraph 3(c) provides that defendants must affirm under oath that they will comply with the requirements of ¶ 3(b) and further requires that defendants must not retain anything in their possession which relates to the Howe Family and must permanently erase or turn over "all sources of digital or electronic copies."[2]

---

[2] Defendants argue that the trial court misquoted ¶ 3(c) of the settlement agreement in its opinion, when it quoted ¶ 3(c) as providing that "all sources of digital or electronic copies shall be permanently erased *and* turned over to Plaintiff." (Emphasis added.) Defendants are correct that the settlement agreement actually reads "all sources of digital or electronic copies shall be permanently erased *or* turned over to Plaintiff." (Emphasis added.) However, despite defendants' assertion, the trial court's decision was not dependent on its misquoting of ¶ 3(c).

Defendants equate permanent erasure with destruction, but the agreement does not direct defendants to destroy any property. Rather, the agreement directs defendants to permanently erase all sources of digital or electronic copies of materials. While the erasure of digital or electronic materials may destroy them, the physical destruction of materials by shredding does not constitute erasure. The Shred-It invoices state that it shredded and destroyed 402 CDs and 861 tapes on November 20, 2008, and 528 tapes and 134 DVDs on November 22, 2008. Paragraph 3(b) specifically directs defendants to turn over to plaintiffs "*any and all* films, CD's, and other analog, electronic, or digital media depicting *any image* of Plaintiffs." (Emphasis added.) There is no suggestion that the items destroyed by Shred-It were sources of digital or electronic copies. As plaintiffs point out, defendants maintained websites and other digital media using plaintiffs' trademarks and images, which is what ¶ 3(c) directed to be permanently erased because those items are incapable of being turned over to plaintiffs. Therefore, according to the settlement agreement, the items in the Shred-It invoices should have been delivered to plaintiff.

Defendants also argue that the trial court inferred some type of inventory requirement in the settlement agreement that required defendants to provide plaintiffs an opportunity to inventory items before defendants permanently erased or destroyed them. Defendants argue that the fact that plaintiffs were not given an opportunity to inventory the items on the Shred-It invoices cannot be a breach of the settlement agreement. However, the trial court's opinion does not reference, even implicitly, that it found that defendants breached the settlement agreement by failing to provide plaintiffs with an opportunity to inventory the property that was destroyed. In fact, at the hearing on the motion, in response to defendants' argument that there was no inventory requirement in the settlement agreement, the trial court specifically stated, "I'm not saying that the agreement said that you were to give them a shredding list, or what you had shredded by this shredding company, I agree with you wholeheartedly, there's nothing in the agreement that says that you were to do that." Therefore, this argument is without merit.

Defendants next argue that the Shred-It invoices do not prove that defendants destroyed property pertaining to plaintiffs, and therefore there was no evidence that they breached the settlement agreement. Defendants are correct that plaintiffs have no way of proving exactly what defendants destroyed. However, this does not preclude a finding that defendants breached the settlement agreement. Even viewing the evidence in a light most favorable to defendants, there is no genuine issue of material that defendants destroyed property in violation of the settlement agreement. Defendants do not contest that they destroyed the items listed on the invoices, which included CDs, DVDs, and tapes. As discussed earlier, defendants were required to turn over these types of items to plaintiffs. Additionally, although defendants argue that the items were their personal property, the settlement agreement is clear that defendants were required to turn over "all personal property depicting, relating, or in any way pertaining to Plaintiffs and/or any member of the Howe Family."

Further, although defendants attempt to argue on appeal that the destroyed property did not depict, relate, or pertain to plaintiffs or the Howe family, they did not actually dispute with

Rather, the trial court's decision was based on the fact that the settlement agreement required defendants to turn over all physical property to plaintiffs, which they did not do.

the trial court that the items were associated with plaintiffs or the Howe family. Defendants rely on the affidavit of Michael Reddy dated February 16, 2012, in which he attests that the property that was destroyed was defendants' property and included "personal family recordings, personal audio voicemail message tapes, personal/privileged court documents, and other documents from my other businesses that were not in any way related to Plaintiffs' or the Howe family." However, in that same affidavit Reddy attests that he and Aaron Howard had Shred-It shred "other materials as mandated by the Settlement Agreement" and that he provided plaintiffs with the two Shred-It invoices to prove that defendants complied with the settlement agreement.

It appears that Reddy is attesting that only the documents from his business were not related to plaintiffs. This interpretation is supported by defendants' response to plaintiffs' motion for summary disposition, in which defendants reference Reddy's affidavit and indicate that it was only the documents from Reddy's business that had nothing to do with plaintiffs or the Howe family, and defendants certainly imply that the other items that were destroyed, which included the tapes, may have related to plaintiffs. For example, in their response, defendants stated that they complied with the settlement agreement when they took the items to Shred-It and permanently erased "[d]efendants' own personal property which may have related to the Howe Family." Defendants go on to state that they provided plaintiffs the invoices as evidence that they "retained nothing in their possession that may relate to the Howe family." Moreover, defendants argue in their response that ¶ 3c allowed them to destroy their own property that may relate to the Howe family. Defendants cannot argue that there is no evidence that items they destroyed depicted, related, or pertain to plaintiffs or the Howe family, but then argue that they destroyed the property in accordance with the settlement agreement. Clearly, there would be no reason to destroy defendants' personal property and provide plaintiffs with invoices indicating such if the property did not depict, relate, or pertain to plaintiffs or the Howe family.

As this Court stated in its prior opinion, "There is no dispute that the items were associated with Gordie Howe, nor is there a dispute that the items were destroyed; rather, defendants contend that the destruction was consistent with the settlement agreement, whereas plaintiffs maintained that the destruction constituted a violation of the settlement agreement." Therefore, although plaintiffs could not prove the content of the property destroyed by defendants, because defendants did not dispute that the items (particularly the tapes, CDs, and DVDs) were associated with plaintiffs or the Howe family to show that a genuine issue of material fact exists, the trial court did not err by granting plaintiffs summary disposition on liability. See *Karaus v Bank of New York Mellon*, 300 Mich App 9, 17; 831 NW2d 897 (2012) (stating that once the moving party meets its burden of supporting its position that there is no factual dispute, the burden shifts to the opposing party to show that a genuine issue of material fact exists).

Finally, defendants argue that the Shred-It invoices and affidavit of Aaron Frezza, Shred-It's operations manager, are inadmissible, and therefore cannot be used by plaintiffs to evidence a breach by defendants. First, with regard to the invoices, defendants' attempt to have them excluded is disingenuous particularly where they have relied on the invoices to establish that they destroyed the property in compliance with the settlement agreement. Defendants should not be permitted to rely on the invoices for their purposes and argue that they are inadmissible for plaintiffs' purposes. Additionally, we decline to address defendants' unsupported argument that

the invoices are hearsay, particularly where that are likely admissible under MRE 803(6) as a business record.

Second, defendants assert that Frezza's first affidavit is unreliable because in the January 13, 2012 affidavit, he recanted the statements made in the earlier affidavit. However, Frezza did not recant anything he stated in the first affidavit. He merely provided further explanation with regard to the statements he made in that affidavit, specifically what type of knowledge he had regarding the information in the invoices, i.e., whether he simply knew the items listed were in fact destroyed or whether he knew what exactly was contained on the items that were destroyed. Therefore, this argument is without merit.

Accordingly, the trial court did not err by granting summary disposition to plaintiffs on liability.

## B. DAMAGES

Defendants next argue that the trial court erred by denying their motion for summary disposition regarding plaintiffs' inability to prove damages as a result of defendants' alleged breach. Damages are an element of a breach of contract claim and "[t]he party asserting a breach of contract has the burden of proving its damages with reasonable certainty, and may recover only those damages that are the direct, natural, and proximate result of the breach." *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). Damages cannot be based on speculation or conjecture, but reasonable certainty does not require mathematical precision. *Hofmann v Auto Club Ins Ass'n*, 211 Mich App 55, 108; 535 NW2d 529 (1995). Where the fact of damages has been established and the only question to be decided is the amount, the certainty requirement is relaxed. *Id.*

Plaintiffs presented sufficient evidence to show that there was a genuine issue of material fact regarding damages. Plaintiffs were not required to prove damages with a mathematical certainty. Rather, the reasonable inferences from the evidence presented shows that plaintiffs suffered an injury, see *Bergen v Baker*, 264 Mich App 376, 387; 691 NW2d 770 (2004) (stating that circumstantial evidence can be used to determine whether a genuine issue of material fact exists for summary disposition), and that they could prove damages with reasonable certainty. Specifically, plaintiffs presented the invoices that showed defendants destroyed numerous tapes, CDs, and DVDs. Defendants admitted they destroyed the items, and did not contest that they related to the Howe family. In fact, Michael Reddy stated that he destroyed them to comply with the settlement agreement—an agreement which required defendants to rid themselves of all things pertaining to plaintiffs and the Howe family. Mark Howe attested in his affidavit that plaintiffs did not receive any films of the Howe family in the property returned by defendants, despite the fact that Aaron Howard and Del Reddy "routinely and systematically filmed, taped, recorded, and photographed" the Howe family "in virtually every conceivable setting, including at ice hockey rinks, during appearances, trips, signings, at home, on vacation, with friends, fans and peers." Howard Baldwin, a movie producer (and personal acquaintance of Gordie Howe) who produced a movie about Gordie Howe, also attested in his affidavit that he would have paid a minimum of six figures for personal footage of the Howes to aid in his movie production about the life of Gordie Howe. He stated that such footage was "invaluable" and that he had little available to him. Viewing the evidence in a light most favorable to plaintiffs, the nonmoving

party, reasonable inferences would permit the jury to find that the items destroyed related to the Howes and plaintiffs would have received a substantial sum of money from Baldwin for their use in his movie. Therefore, there was a genuine issue of material fact regarding damages, and the trial court did not err by denying defendants' motion for summary disposition regarding damages.

## III. QUALIFICATION OF EXPERT WITNESS

Defendants next argue that the trial court erred by denying its motions for judgment notwithstanding the verdict (JNOV) and new trial because plaintiffs' damages expert, Howard Baldwin, was not qualified to give expert testimony. We review de novo a trial court's denial of a motion for JNOV. *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 131; 666 NW2d 186 (2003). The evidence and all legitimate inferences are reviewed in a light most favorable to the nonmoving party. *Wilkinson v Lee*, 463 Mich 388, 391; 617 NW2d 305 (2000). A motion for JNOV should only be granted if the evidence fails to establish a claim as a matter of law. *Id.* "If reasonable jurors could have honestly reached different conclusions, the jury verdict must stand." *Morinelli v Provident Life & Accident Ins Co*, 242 Mich App 255, 260-261; 617 NW2d 777 (2000).

Additionally, we review for an abuse of discretion a trial court's decision to grant or deny a motion for a new trial, *Shuler v Mich Physicians Mut Liability Co*, 260 Mich App 492, 509; 679 NW2d 106 (2004), and its ruling regarding a proposed expert's qualifications to testify, *Kiefer v Markley*, 283 Mich App 555, 556; 769 NW2d 271 (2009). "An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes." *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 302 Mich App 7, 21; 837 NW2d 686 (2013).

MRE 702 governs the admissibility of expert testimony and provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As the gatekeeper, "The trial court has an obligation under MRE 702 'to ensure that any expert testimony admitted at trial is reliable.' " *Clerc v Chippewa County Way Memorial Hosp*, 267 Mich App 597, 602; 705 NW2d 703 (2005), quoting *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780; 685 NW2d 391 (2004).

Notably, although the trial court instructed the jury regarding expert witness testimony, plaintiffs never moved to qualify Baldwin as an expert at trial and plaintiffs never elicited expert

testimony from Baldwin.[3]  Rather, a review of his testimony reveals that Baldwin merely provided lay witness testimony based on his experience producing a film about Gordie Howe and other films.

MRE 701 addresses opinion testimony by lay witnesses and provides:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Further, regarding lay witnesses, MRE 602 provides,

A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony. . . .

Baldwin testified that he had been producing films for over 30 years.  Movies he has produced include, *Ray*, *Sahara*, *Mystery Alaska*, and *Sudden Death*.  Baldwin also testified that he recently produced a film about Gordie Howe in 2012, entitled *Mr. Hockey*, which was released in Canada in April 2013.  He testified that they had to recreate most of the memorabilia and footage because the Howe family was unable to supply it.  In making *Ray*, Baldwin testified that he had access to personal footage of Ray Charles, which was "really helpful" for authenticity of the movie, especially to recreate scenes.  Baldwin testified that having access to home movies or personal footage also allows the actors to become acquainted with the character they are playing to learn their mannerisms and particular nuances.

Baldwin further testified that as a producer he was familiar with production costs.  He testified that he produced at least ten films where he had to acquire "life rights," and testified that it could cost anywhere from $500,000 to over $1,000,000 to acquire life rights, memorabilia, and personal footage and images, depending on the extent that he would use them.  In lieu of

---

[3] Aside from the trial court's brief reference that "plaintiffs' expert" (referring to Baldwin) would be called to testify via Skype, defendants were the only people to refer to Baldwin as plaintiffs' expert when they attacked his qualifications in their opening statement.  Plaintiffs asserted at oral argument that they did move to qualify Baldwin as an expert and were asked by the trial court to lay a foundation.  However, a review of the record shows that the only time plaintiffs were asked to lay a foundation was when defendants objected to Baldwin's testimony regarding the value of the footage relating to Howe.  Defendants' objections were based on speculation, lack of foundation (no facts in evidence), and relevance.  The trial court never formally declared Baldwin to be an expert.  At most, the trial court and the parties all seemed to act as if he were qualified as an expert.  However, all, or almost all, of his testimony was lay testimony based on his own experience.  As noted in footnote 4, to the extent Baldwin gave expert testimony, its admission was harmless error.

personal footage for *Mr. Hockey*, he did obtain some playing footage from the National Hockey League, which was about a minute and a half in length, and which cost him $75,000. Baldwin testified that normally the NHL charges $150,000, but he received a "friends and family discount." When asked what value he would place on the destroyed property, Baldwin testified that if all of the 1,389 tapes that were destroyed contained images or footage of Gordie Howe and were available to him for a film, it would be "incredibly valuable" and worth millions of dollars, given that he paid $75,000 to the NHL (which normally charges $150,000) for one and a half minutes of playing footage. However, he acknowledged that he could not place an exact monetary figure on the property without knowing exactly what was on the tapes.

While Baldwin's testimony certainly involves some type of specialized knowledge, it did not rise to the level of expert testimony. Specifically, Baldwin did not provide an opinion as to the value of the destroyed property containing personal footage of Gordie Howe based on movie industry standards as a whole, and his testimony did not involve principles and methods. Rather, he testified what he would have paid for personal footage of Gordie Howe based on his experience producing a movie about Gordie Howe and other sports celebrities. His testimony was based on personal knowledge of the matter and was helpful to the determination of a fact in issue, i.e., the value of personal footage of Gordie Howe. Therefore, the trial court did not err by denying defendants' motions for JNOV or new trial on this ground because Baldwin provided proper lay opinion testimony pursuant to MRE 602 and 701.[4]

## IV. IMPEACHMENT EVIDENCE

Defendants next argue that the trial court prevented them from impeaching Baldwin regarding his prior deposition testimony, and therefore, it should have granted defendants' motion for a new trial. Generally, we review for an abuse of discretion a trial court's decision to grant or deny a motion for a new trial, *Shuler*, 260 Mich App at 509, and to admit or exclude evidence, *Barrett v Kirtland Community College*, 245 Mich App 306, 325; 628 NW2d 63 (2001). However, defendants failed to preserve this issue by making an offer of proof at trial. Under MRE 103(a)(2), the proponent of the excluded evidence must make an offer of proof to preserve the issue for appeal, unless it is apparent from the context of the questions asked. *Phinney v Perlmutter*, 222 Mich App 513, 529; 564 NW2d 532 (1997), overruled on other grounds *Garg v Macomb Co Community Mental Health Servs*, 472 Mich 263; 696 NW2d 646 (2005). In this

---

[4] Even if we were to conclude that Baldwin's specialized knowledge of film production costs rendered his testimony expert testimony, the admission of his testimony would be harmless error. See MCR 2.613(A) (An error in the admission of evidence is not grounds for granting a new trial or setting aside a verdict "unless refusal to take this action appears to the court inconsistent with substantial justice") and *Craig v Oakwood Hosp*, 471 Mich 67, 85; 684 NW2d 296 (2004) (noting that reversal on the basis of the trial court's failure to adequately perform its gatekeeping obligation to determine reliability of the expert testimony is subject to the harmless error rule of MCR 2.613(A)). A review of the record shows that Baldwin was qualified to provide expert testimony regarding the costs associated with film production based on his knowledge and experience as a film producer for over 30 years. MRE 702.

case, it is not apparent from the context of the questions asked what the substance of the impeachment evidence was. Defense counsel never attempted to make a record of the trial court's ruling, take issue with the ruling, or ask a substantive question in an attempt to impeach Baldwin. Rather, the record of the trial implies that defense counsel was satisfied with the ruling made during the bench conference. It was particularly imperative in this case that defendants make a record of the alleged error, particularly where they claim that the trial court made a ruling at the bench conference that prevented them from doing any effective cross-examination of Baldwin, but the trial court stated that it was merely preventing defense counsel from questioning Baldwin about his *de bene esse* deposition, which was stricken from the record at defendants' request.

Further, defendants' argument that the substance of the evidence was made known in their motion in limine filed before trial is unavailing. The motion in limine sought to exclude all testimony of Baldwin and did not involve the impeachment issue at hand. Based on the record, it appears defendants did not inform the trial court what they wished to impeach Baldwin on until they filed their motion for a new trial. Without a record, this Court is left to speculate as to what defendants intended to do at trial and what exactly the trial court ruled on during the bench conference. Therefore, we decline to address this unpreserved issue.[5]

## V. SPOLIATION INSTRUCTION

Defendants next argue that the trial court erred by giving a spoliation instruction. We review claims of instructional error de novo, examining the instructions as a whole to determine whether an error occurred. *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). However, the applicability of a jury instruction to a given situation is within the sound discretion of the trial court, and a trial court's decision in this regard will be reviewed by this Court for an abuse of discretion. *Jackson v Nelson*, 252 Mich App 643, 647; 654 NW2d 604 (2002). "The instructions should include all the elements of the plaintiff's claims and should not omit material issues, defenses, or theories if the evidence supports them." *Case*, 463 Mich at 6. "Even if somewhat imperfect, instructions do not create error requiring reversal if, on balance, the theories of the parties and the applicable law are adequately and fairly presented to the jury." *Id.*

---

[5] Even if we were to conclude that defendants properly preserved this issue for appeal, any error in preventing defendants from using the deposition to impeach Baldwin was harmless. See MRE 103(a) (stating that error may not be predicated on a ruling which excludes evidence unless a substantial right of the party is affected). It appears the primary testimony from Baldwin's *de bene esse* deposition that defendants wished to impeach Baldwin with were his statements regarding how he calculated the value of the destroyed property. Specifically, he stated, "There are no facts without actually knowing what was—what we're talking about here. So everything is hypothetical. Everything is hypothetical." Using Baldwin's deposition to impeach his trial testimony likely would not have made a difference where Baldwin's trial testimony makes it clear that he was giving an estimate of damages and that he could not place a specific monetary value on the images and footage without knowing the content.

-11-

Reversal is not required unless the failure to do so would be inconsistent with substantial justice. *Id.*

Defendants argue that a spoliation instruction was not warranted because the alleged spoliation flowed from the same acts that constituted the breach of contract, and spoliation only occurs when evidence is destroyed after the cause of action accrues. Defendants argue that a spoliation instruction in this case creates a tort of spoliation which is not recognized under Michigan law. However, defendants do not cite any case law which states that spoliation only occurs after the cause of action accrues, and this Court has specifically stated, "[e]ven when an action has not been commenced and there is only a potential for litigation, the litigant is under a duty to preserve evidence that it knows or reasonably should know is relevant to the action." *Brenner v Kolk*, 226 Mich App 149, 162, 573 NW2d 65 (1997). Accordingly, defendants' argument is without merit. The instruction was appropriate so long as it was supported by the evidence. *Case*, 463 Mich at 6.

The trial court instructed the jury as follows:

Members of the jury, I instruct that Defendants Aaron Howard, Del Reddy, Mike Reddy, and Immortal Investments, LLC, in this case, has not offered the evidence of the property destroyed. As this evidence was under the control of the Defendants and could have been produced by them, and no reasonable excuse for Defendants' failure to produce the evidence was given, you may infer that the evidence would have been adverse to the Defendants.

This instruction comports with MI Civ JI 6.01(a). However, defendants argue that MI Civ JI 6.01(d) was the more appropriate instruction, which provides,

The [plaintiff/defendant] in this case has not offered [testimony of *[name]/[Identify exhibit.]*]. You may infer that this evidence would have been adverse to the [plaintiff/defendant] if you believe that the evidence was under the control of the [plaintiff/defendant] and could have been produced by [him/her], and no reasonable excuse for [plaintiff's/defendant's] failure to produce the evidence has been shown.

Defendants argue that this instruction was more appropriate because the trial court never made any specific finding that defendants lacked a reasonable excuse to destroy the evidence. However, MI Civ JI 6.01(d) was not appropriate based on the facts of the case. MI Civ JI 6.01(d) is to be read where there is a question of fact regarding a party's control and reasonable excuse. It was undisputed that the evidence was within defendants' control. They admitted that it was their personal property which may have related to plaintiffs and that they destroyed it.

The instruction given by the trial court comported with the evidence at trial and does not require reversal. MI Civ JI 6.01(a) is to be read where the trial court finds that the evidence was under the party's control, the party could have produced the evidence, and the party has no reasonable excuse for failing to produce the evidence. There was no question that defendants did in fact destroy the property in violation of the settlement agreement. Although defendants argue that they reasonably thought they were destroying the property in compliance with the settlement

agreement, Del Reddy also admitted at trial that he destroyed the property, in part, because he was being vindictive towards Mark Howe.  Further, the settlement agreement plainly states that defendants were required to turn over to plaintiffs all personal property relating to the Howe family, and as discussed, defendants never contested that the property that was destroyed related to the Howe family.  Accordingly, there is no evidence that defendants had a reasonable excuse for destroying the property, and therefore, the trial court did not err by reading MI Civ JI 6.01(a).

## VI.  ATTORNEY FEES

Defendants next argue that the trial court erred by granting plaintiffs' post-judgment motion for contractual attorney fees.  Defendants do not challenge the amount or reasonableness of the attorney fees.  They only argue that the attorney fees were part of plaintiffs' breach of contract claim and had to be specifically pleaded and proven at trial, not in a post-trial motion.  Whether a party is entitled to attorney fees and costs pursuant to a contract is a question of law that we review de novo.  *Fleet Business Credit, LLC v Krapohl Lincoln Mercury Co*, 274 Mich App 584, 588; 735 NW2d 644 (2007).

Paragraph 5 of the settlement agreement provides in relevant part, "The prevailing party in any proceeding to enforce this agreement, or any remedy contemplated by this Agreement, shall be entitled to recover, in addition to any other remedy, actual costs and attorney fees incurred in the enforcement."

This Court has specifically held, "When contract language specifically provides that in litigation concerning the contract, the prevailing party shall recover attorney fees, attorney fees are not special damages, and therefore are generally recoverable by the prevailing party even if there was no specific prayer for the recovery of attorney fees in the complaint."  *Fleet Business Credit*, 274 Mich App at 592.  While a party is not required to specifically plead an award of attorney fees under a contractual provision, the party seeking the award of attorney fees still must do so as part of a claim against the opposing party.  *Pranksy v Falcon Group, Inc*, 311 Mich App 164, 194-195; 874 NW2d 367 (2015).  In this case, in the complaint, plaintiffs requested attorney fees and costs as part of their damages for bringing this action.  Therefore, plaintiffs sufficiently stated a cause of action to recover attorney fees under the contract.

With regard to whether plaintiffs were required to submit proof of their attorney fees at trial as part of their damages claim, defendants rely on an unpublished case,[6] which cites *Zeeland Farm Servs, Inc v JBL Enterprises, Inc*, 219 Mich App 190; 555 NW2d 733 (1996), to support their argument.  In *Zeeland*, this Court stated that "[a] party claiming the right to recover attorney fees under a contract must introduce evidence of the reasonableness of the attorney fees to establish a prima facie case and to avoid a directed verdict."  *Id*. at 196.  However, this Court did not specifically state that contractual attorney fees must be proven at trial.  Rather, *Zeeland* involved a debt collection action, in which the plaintiff sought to recover the balance due on the defendant's open account and the attorney fees incurred in collecting the debt as permitted by the credit agreement.  *Id*. at 191-192.  It appears that the attorney fees were already incurred in

---

[6] Unpublished cases are not precedentially binding on this Court.  MCR 7.215(C)(1).

attempting to collect the debt, and the plaintiff was seeking to recover the fees as part of its claim. *Id.* at 192-193. Therefore, this Court noted that the plaintiff was required to introduce evidence of the reasonableness of the attorney fees to avoid a directed verdict. *Id.* at 196.

In this case, plaintiffs could not prove at trial that they were entitled to attorney fees or the reasonableness of those fees, where the contract explicitly states that a party cannot recover attorney fees until they prevail in the action to enforce the agreement. Plaintiffs did not prevail in the action to enforce the agreement until the jury decided the issue of damages. In *Zeeland*, the credit agreement permitted the plaintiff to recover its attorney fees if defendant breached the agreement, *id.* at 199, which is different from this case, where the contract allows either party to recover attorney fees if they prevail in an action to enforce the agreement. Had defendants in this case been the prevailing party, they could have sought attorney fees under the agreement, but, as discussed, this could not be determined until after the jury decided the case. Therefore, the trial court did not err by holding an evidentiary hearing regarding the reasonableness of plaintiffs' attorney fees, and subsequently granting plaintiffs' post-judgment motion for contractual attorney fees.

## VII. REMITTITUR

Finally, defendants argue that the trial court erred by denying its motion for remittitur. We review "a trial court's decision to deny a motion for remittitur for an abuse of discretion." *Diamond v Witherspoon*, 265 Mich App 673, 692; 696 NW2d 770 (2005). In doing so, we review the evidence in the light most favorable to the nonmoving party. *Id.* at 693. Further, this Court has stated:

> [T]he question of the excessiveness of a jury verdict is generally one for the trial court in the first instance. The trial court, having witnessed all the testimony and evidence as well as having had the unique opportunity to evaluate the jury's reaction to the proofs and to the individual witnesses, is in the best position to make an informed decision regarding the excessiveness of the verdict. Accordingly, an appellate court must accord due deference to the trial court's decision and may only disturb a grant or denial of remittitur if an abuse of discretion is shown. [*Palenkas v Beaumont Hosp*, 432 Mich 527, 531; 443 NW2d 354 (1989). See also *Diamond*, 265 Mich App at 692-693.]

This Court in *Diamond* thoroughly summarized the law regarding remittitur:

> In determining whether to grant a motion for remittitur a trial court must consider whether the evidence supported the jury award. *Henry v Detroit*, 234 Mich App 405, 414; 594 NW2d 107 (1999). The trial court's inquiry is limited to objective considerations regarding the evidence presented and the conduct of the trial. *Palenkas, supra* at 532–533; *Weiss v Hodge (After Remand)*, 223 Mich App 620, 637, 567 NW2d 468 (1997). Remittitur is justified when a jury verdict exceeds the highest amount the evidence will support. MCR 2.611(E)(1). When determining whether an award is excessive, a court may consider whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact, whether it was within the limits

of what reasonable minds would deem to be just compensation for the injury inflicted, and whether the amount actually awarded is comparable to other awards in similar cases. *Palenkas*, *supra* at 532–533. A verdict should not be set aside simply because the method of computation used by the jury in assessing damages cannot be determined, unless it is not within the range of evidence presented at trial. *Green v Evans*, 156 Mich App 145, 156–157; 401 NW2d 250 (1985). [*Diamond*, 265 Mich App at 693-694.]

First, contrary to defendants' argument, Baldwin was not the only witness to testify regarding damages and he did not testify that damages were capped at $1,000,000. Baldwin testified that it could cost anywhere from $500,000 to over $1,000,000 to acquire life rights, memorabilia, and personal footage depending on the extent that he would use the materials. He also testified that if all of the 1,389 tapes that were destroyed contained images or footage of Gordie Howe, it would be worth millions of dollars, given that he paid $75,000 to the NHL (which normally charges $150,000) for one and a half minutes of playing footage.

Second, although there was no way to prove what those items contained, especially how many photographs or videos related to the Howes, the reasonable inferences from the evidence presented supports the jury's verdict. Baldwin testified that without the friends and family discount, film producers would have paid the NHL $150,000 for a one and a half minute clip of Gordie Howe playing hockey, and seemed to indicate that personal footage is just as valuable, especially to recreate scenes and aid the actors in their character portrayal. Based on his testimony, 20 minutes of footage alone would be worth $3,000,000. Additionally, Felix Gatt, a personal friend of Gordie Howe, testified regarding the numerous times he witnessed Del Reddy and Aaron Howard videotape Howe's various appearances and events from 1996 to 2006, which easily would have surpassed 20 minutes of footage. Gatt also testified that Reddy and Howard took photographs at these same appearances and events of Gordie Howe, some of which included other sports celebrities. Testimony by Mark Howe and Marty Howe indicates that photos of Gordie Howe sell for $100 to $1000 depending on the size and who is pictured with Howe, and that CDs and DVDs can hold anywhere from hundreds to one thousand photos. Mark Howe also testified that when defendants returned material to plaintiffs, there were no photographs or videotapes returned. Instead, defendants presented plaintiffs with the Shred-It invoices that showed defendants destroyed 1,389 tapes, 402 CDs, and 134 DVDs.

Defendants also did not contest that the items they destroyed related to the Howes. Defendants claimed it was mostly their personal property, but Aaron Howard testified that he took occasional videos relating to the Howes; however, because they were mixed in with his personal items, and because he was not going to return any of his personal items to the Howes, everything was destroyed.

Further, as discussed in Issue V, because this evidence was under defendants' control and was destroyed by defendants without a reasonable excuse, the jury was permitted to infer that the evidence would have been adverse to defendants. Therefore, the jury's verdict was within the range of evidence presented at trial. While the jury's exact calculations may be unknown, a verdict should not be set aside simply because the method of computation used by the jury in assessing damages cannot be determined. *Green*, 156 Mich App at 156–157.

Affirmed.  Plaintiffs, being the prevailing party, may tax costs pursuant to MCR 7.219.


/s/ Donald S. Owens
/s/ Stephen L. Borrello
/s/ Cynthia Diane Stephens